UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
:
CARL W. HENDERSON, JR.,                                  :
ADMINISTRATOR OF THE ESTATE OF        :
DAVID M. HENDERSON, FRANCISCO SOLIS, :
TRUSTEE OF MESSENGER TRUST ONE,       :
AND MICHAEL S. HENDERSON,                    :
SUCCESSOR TRUSTEE OF                           :
MESSENGER TRUST ONE,                            :
:                  __OPINION__
          Plaintiffs,          :        __AND ORDER__
:
    - against -                               :        06 Civ. 1039 (SAS)
:
METROPOLITAN BANK & TRUST              :
COMPANY,                                               :
:
          Defendant.          :
-------------------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

On February 9, 2006, Carl W. Henderson, Jr., of Tennessee,

Administrator of the Estate of David M. Henderson; Francisco Solis, of California,

Trustee of Messenger Trust One ("the Trust"); and Michael S. Henderson, of New

Mexico, Successor Trustee of the Trust (collectively "Plaintiffs"), filed suit against

Metropolitan Bank and Trust Co. ("Metrobank"), a corporation headquartered in

Makati City, Philippines,[1] seeking to enforce a "Manager's Check" allegedly issued by Metrobank, with a face value of twelve billion pesos.[2]  Plaintiffs also seek damages of $75 million, representing interest accrued since the instrument was issued.[3]  Metrobank has moved to dismiss the Complaint on the ground of *forum non conveniens,* arguing that this action should be heard in the Philippines.[4]

## II.     BACKGROUND

### A.     The Manager's Check[5]

A manager's check is a negotiable instrument akin to a cashier's check, which is "drawn by the cashier of a bank upon the bank itself."[6]  The

---

[1]     *See* Complaint ("Compl.") at 1;  Metrobank 2005 Annual Report, Ex. 7 to Declaration of Benjamin Zelermyer, counsel for defendant, in Support of Motion to Dismiss the Complaint ("Zelermyer Decl."), at 73.

[2]     *See* Compl. ¶¶ 7, 20.  The Complaint alleges that at the time the Complaint was filed, twelve billion pesos was equivalent to more than $225 million.

[3]     *See* 6/26/06 Affidavit of Jospeh J. D'Erasmo, counsel for plaintiffs ("D'Erasmo Aff.").

[4]     *See* Notice of Motion to Dismiss the Complaint on the Ground of *Forum Non Conveniens* ("Motion to Dismiss").

[5]     For the purposes of this motion, the facts are drawn from the Complaint unless otherwise noted.

[6]     Compl. ¶ 8 (quoting *The International Corporate Bank vs. Sps. Francis S. Gueco and Ma. Luz E. Gueco,* G.R. No. 141968 (Supreme Court, First Division, Rep. of Philippines, Feb. 12, 2001)).

Manager's Check in dispute here was issued as interest payments on accounts at Metrobank "established by confidential benefactors for humanitarian and socio-political purposes in the Philippines."[7]  Although the accounts in question were held at Metrobank, the "assets which gave rise to the Manager's Check" originated as cash transfers from Citibank in New York.[8]  Jocelyn C. Duran was an "arranged signatory" on the Metrobank accounts, one of which was Account No. 00701-5500691-8.[9]  The Manager's Check was issued on this account to Duran as payee, on March 21, 2000.[10]

At some point subsequent to the check's issuance, Duran "attempted to convert the instrument into cash funds" at Metrobank, and it was dishonored.[11]  Duran "sought the assistance of a high-placed government official," and "[t]hereafter, [Metrobank], through its President and Director, Antonio S. Abacon, Jr., offered to convert the instrument into cash equivalent to one-half its [face] value . . . if [Duran] would execute a release of any and all claims against accounts

---

[7]     *Id.* ¶¶ 7, 9.

[8]     *Id.*

[9]     *Id.* ¶¶ 7, 9.

[10]    *See id.* ¶ 7.

[11]    *Id.* ¶ 10.

held in her name, at that time, in Metrobank."[12]  Duran refused this offer.[13]

Plaintiffs allege that as a result, Duran "experienced threats to the physical safety

of herself and her family."[14]  Duran thereupon "transferred her authority to

negotiate the Manager's Check . . . *via* a Special Power of Attorney . . . to Janito

C. Perez."[15]  The Complaint does not state whether Duran ever endorsed or

negotiated the check to Perez.

Perez met with Metrobank representatives in October, 2002, and

Metrobank once again refused to honor the check.[16]  In order to safeguard the

instrument, and to facilitate "further efforts to resolve any issues that were

preventing the check from being honored," Perez arranged for another transfer of

the instrument.[17]  Perez delivered the check to David M. Henderson, and executed

"a formal assignment [of the check] and Special Power of Attorney, individually

---

[12]  *Id.* ¶¶ 10-11.

[13]  *See id.* ¶ 11.

[14]  *Id.*

[15]  *Id.* ¶ 12.

[16]  *See id.* ¶ 13.

[17]  *Id.*

and as Trustee of Messenger Trust One."[18]  The Trust was formed "under the laws

of Nevada" on August 7, 2002, shortly before Perez' meeting with Metrobank

representatives.[19]  Plaintiffs allege that the check was endorsed to the Trust

sometime thereafter, but do not state who endorsed it or when.[20]

On April 2, 2003, David Henderson brought the Manager's Check

into the United States.[21]  He died on September 11, 2003.[22]  David Henderson's

"interest in the check is now an asset of his estate, administered by his brother . . .

Carl W. Henderson."[23]  Henderson's son, Michael Henderson, is identified as

successor trustee to the Trust.[24]

**B.    The Parties' Evidentiary Submissions**

In support of its motion, Metrobank has provided an Affidavit by

Regis V. Puno, an attorney admitted to the Philippine Bar and former

---

[18]     *Id.*

[19]     *See id.* ¶ 5.

[20]     *See id.* ¶ 15.

[21]     *See id.* ¶ 16.

[22]     *See id.* ¶ 14.

[23]     *Id.*

[24]     *Id.* (introductory unnumbered paragraph).

Undersecretary of the Philippine Department of Justice.[25]  This affidavit is submitted as an expert opinion on the law of the Philippines and on the adequacy of the Philippines as a forum for this case.[26]  Puno states that the Complaint is "properly cognizable by Philippine Courts as a Civil Case," and that Metrobank is subject to the Phillippine courts' jurisdiction.[27]  Puno also states that the Revised Rules of the Court of the Philippines provide for compulsory process to compel witness testimony and discovery, including interrogatories, depositions, and production of documents, and that he believes, based on his personal experience, that the case "will most likely be decided in a period of two (2) years."[28]  Finally, it is Puno's opinion that "there is no reason to believe that the Philippine courts would be biased in favor of or against any of the parties to the case."[29]

Puno identifies several Philippine laws that he believes will be applicable to this case, including: Republic Act No. 386 (the Civil Code of the Philippines), Republic Act No. 1405 (the Secrecy of Bank Deposits Law),

---

[25]     *See* Affidavit of Regis V. Puno ("Puno Aff."), Ex. 11 to Motion to Dismiss ¶ 3.

[26]     *See id.* ¶ 4.

[27]     *Id.* ¶ 6.1.

[28]     *Id.* ¶¶ 6.2, 6.5.

[29]     *Id.* ¶ 6.4.

Republic Act No. 8791 (the General Banking Law), Republic Act No. 9160, Act

No. 2031 (the Negotiable Instruments Law), and the Revised Penal Code of the

Philippines.[30]

Metrobank has also submitted all of the initial disclosures  pursuant

to Rule 26(a)(1) of the Federal Rules of Civil Procedure.[31]  Plaintiffs' disclosures

identify fourteen named individuals in addition to Plaintiffs, who are likely to have

information supportive of their allegations.  Eleven of these live (or are presumed

to be living) in the Philippines.[32]  The remaining three live in Canada, India, and

New Jersey (an expert witness who has examined the check to determine its

authenticity).[33]  In addition, Plaintiffs identify unnamed Citibank managers from

its offices at 111 Wall Street in New York, and from Makati City, Philippines, as

persons who have relevant information.[34]   Plaintiffs also list documents or

categories of documents currently in their possession.  These include documents

---

[30]     *See id.* ¶ 6.6.

[31]     *See* Plaintiffs' Initial Disclosures Pursuant to Rule 26(a)(1) ("Pl.
Disclosures"), Ex. 2 to Reply Declaration of Benjamin Zelermyer; Defendant's
Initial Disclosures Pursuant to Rule 26(a)(1) ("Metrobank's Disclosures"), Ex. 9 to
Motion to Dismiss.

[32]     *See* Pl. Disclosures (witnesses) ¶¶ 2-5, 9, 13-14.

[33]     *See id.* ¶¶ 10-12.

[34]     *See id.* ¶¶ 7-8.

relating to the accounts and transactions in the Philippines which gave rise to the issuance of the Manager's Check.[35]

Metrobank's initial disclosures name eleven individuals or entities with discoverable information that Metrobank may use for its defenses, one of whom is also listed by Plaintiffs. All but one of these are residents of the Philippines, and the residence of the eleventh is unknown.[36] These individuals are alleged to have information concerning the instrument and accounts at issue, Metrobank business and record-keeping practices, the Citibank transactions, or the October, 2002 meeting between Perez and Metrobank representatives.[37] Metrobank also identifies several categories of documents located in its Makati City headquarters.[38]

Plaintiffs submit excerpts from *The Judicial Reform Index for the Philippines*, a 2006 report of the Asia Law Initiative of the American Bar Association ("ALI") as evidence that corruption and inefficiency render the Philippines an inadequate forum in which to litigate this dispute. Metrobank has

---

[35]    *See id.* (documents) ¶ 2.

[36]    *See* Metrobank Disclosures ¶¶ A1-A11.

[37]    *See id.*

[38]    *See id.* ¶¶ B1-B6.

provided further excerpts of the report in rebuttal.[39]   The report describes itself as "an attempt to identify specific conditions . . . in a country's judicial system and assess how well these correlate to specific reform criteria."[40]   Several of the thirty criteria assessed in the report relate to the efficiency and integrity of the Philippine judiciary.[41]   The report combines objective and subjective information, much of it gathered "by limited questioning of a cross-section of judges, lawyers, journalists, and outside observers with detailed knowledge of the judicial system."[42]   The report provides discussion and analysis for each of the criteria measured, and an executive summary of critical findings.[43]

One excerpt of the report provided by Plaintiffs concludes that judicial decisions in the court system of the Philippines are not "based solely on the facts and law without any undue influence from senior judges (*e.g.*, court

---

[39]     *See* Asia Law Initiative, The American Bar Association, *The Judicial Reform Index for the Philippines* (2006) ("ALI Report"), Pages i-iv, 1-7, and 35-36 as Ex. 2 to Plaintiffs' Opposition to Defendant's Motion to Dismiss on the Grounds of *Forum Non Conveniens* ("Pl. Opp."); Pages 12-17 and 42-45 as Ex. 11 to Reply Declaration of Benjamin Zelermyer.

[40]     ALI Report at 1.

[41]     *See id.*, Table of Contents.

[42]     *Id.* at iii.

[43]     *See id.* at iii, 1.

-9-

presidents), private interests, or other branches of government."[44]  The report's

discussion of these findings begins by stating that corruption is "difficult to

document and measure."[45]  The investigators' negative conclusion is based in large

part on reports published by other non-governmental organizations.[46]  One of these

is a report by Freedom House, which concluded that the Philippine judiciary

"seems to 'favor[] individuals with political connections or wealth.'"[47]  Freedom

House, in turn, based its findings on the results of a 2004 opinion poll.[48]  The ALI

report quotes only a single result from the poll: "only 40% of those surveyed in the

Philippines agreed with the statement: 'Whether rich or poor, people who have

cases in court generally receive equal treatment.'"[49]  The ALI report states: "[t]his

perception may be corroborated" by the results of another poll, conducted by the

Social Weather Station, which surveyed judges and lawyers in the Philippines and

found that twenty five percent of lawyers believed that "many/very many judges

_____

[44]     *Id.* at 35.

[45]     *Id.*

[46]     *See id.* at 35-36.

[47]     *See* ALI Report at 35 (citing Freedom House, *Countries at the Crossroads 2005: A Survey of Democratic Governance*).

[48]     *See id.* (citing same).

[49]     *Id.* (citing same).

are corrupt."[50]  The same poll found that only seven percent of judges believed

this.[51]  The ALI report also refers to a third opinion poll by an unnamed

organization, which measured public perception of the "sincerity of public

agencies in fighting corruption," and which assigned these agencies "Net Sincerity

Ratings."[52]  The ALI report states that the Supreme Court of the Philippines

received a "moderate" Net Sincerity Rating, while the Regional Trial Courts

received a "mediocre" rating.[53]  Apart from describing these surveys, the ALI

report summarizes its own investigations in a few short paragraphs, which lack

any detailed fact-finding.[54]

      The ALI report also cites positive findings, such as the finding that

there is "[v]igorous oversight and investigation of conduct complaints against

judges and court staff."[55]  The investigators also concluded that "[j]udges are

---

[50]    *Id.* (citing Social Weather Station, *2003-2004 Lawyers' and Judges' Survey on the State of the Judiciary and the Legal Profession*).

[51]    *See id.* (citing same).

[52]    *Id.*

[53]    *Id.*  The role of the Regional Trial Courts in the judicial system of the Philippines is roughly equivalent to that of the Federal District Courts in the United States.  *Id.* at 7.

[54]    *See id.* at 36.

[55]    *Id.* at 2.

appointed based on objective criteria, such as passage of an exam, performance in

law school . . . experience . . . and reputation in the legal community.  While

political elements may be involved, the overall system should foster the selection

of independent, impartial judges."[56]

The ALI report states that the Philippine court system is to some

degree troubled by inefficiency.  The filing-to-completion time for a typical case

may exceed five years, and at the end of 2005 there was a backlog of

approximately 800,000 cases.[57]  However, the report also indicates that a large

number of these cases are probably inactive, having been settled by the parties or

abandoned but never formally removed from the docket.[58]  The report does not

state what proportion of the backlog consists of active cases that will require

further judicial attention.  Portions of the report provided by Metrobank show that

the Regional Trial Courts closed 190,503 cases in 2005, compared with 191,703

new cases filed.[59]

## III.   APPLICABLE LAW

---

[56]     *Id.* at 14.

[57]     *See id.* at 2.

[58]     *See id.*

[59]     *See id.* at 43.

-12-

## A.     Forum Non Conveniens

"*Forum non conveniens* is a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim."[60]  Courts may decline to exercise jurisdiction under this doctrine when it is determined that, weighing "relative advantages and obstacles to fair trial" in the alternative fora, and practical considerations of which forum will "make trial of a case [more] easy, expeditious and inexpensive," "the balance is strongly in favor" of the defendant's request for dismissal in favor of a more convenient forum.[61]

In deciding whether to dismiss on this ground, courts in this Circuit undertake a three-step analysis.  First, courts determine the degree of deference due the plaintiff's choice of forum.[62]  Next, courts examine whether there is an adequate alternative forum for the dispute.[63]  Finally, courts engage in a balanced assessment of the competing private interests of the parties in the choice of forum,

---

[60]     *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000) (quotation omitted).

[61]     *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947).

[62]     *See Iragorri v. United Techs. Corp.,* 274 F.3d 65, 73 (2d Cir. 2001) (*en banc*).

[63]     *See id.*

-13-

and the public interests of the alternative fora under consideration.[64]  Throughout,

the defendant bears the burden of showing that each stage of the analysis "tilt[s]

strongly in favor of trial in the foreign forum."[65]  The action should be dismissed

only if the chosen forum is shown to be genuinely inconvenient and the selected

forum significantly preferable."[66]

### 1.    The Degree of Deference Accorded a Plaintiff's Choice of Forum

"Any review of a forum non conveniens motion starts with 'a strong

presumption in favor of the plaintiff's choice of forum.'"[67]  However, the strength

of this presumption, and the degree of deference due the plaintiff's selection,

"varies with the circumstances."[68]  The degree of deference to be accorded the

plaintiiff's choice of forum is not determinative of the final outcome; rather, it

merely re-calibrates the scales for the remaining two steps of the analysis.[69]

---

[64]     *See id.* at 73-74.

[65]     *Wiwa,* 226 F.3d at 108.  *Accord P.T. United Can Co. v. Crown Cork and Seal Co.,* 138 F.3d 65, 74 (2d Cir. 1998).

[66]     *Iragorri,* 274 F.3d at 74-75.

[67]     *Norex Petroleum Ltd. v. Access Indus., Inc.,* 416 F.3d 146, 154 (2d Cir. 2005) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)).

[68]     *Iragorri,* 274 F.3d at 71.

[69]     *See id.* at 73-74.

-14-

"[T]he greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal."[70]   Conversely, the less deference is granted the plaintiff's choice, "the easier it becomes for the defendant to succeed on a forum non conveniens motion by showing that convenience would be better served by litigating in another country's courts."[71]

A "plaintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum."[72]   The choice of a United States forum by a foreign plaintiff is entitled to less deference.[73]   "The reason great deference is generally afforded a plaintiff's choice of its home forum 'is because it is presumed to be convenient.'"[74]   When suing a foreign defendant, a United States plaintiff's choice to litigate outside his home district does not diminish the normal deference due his choice.[75]

---

[70]   *Id.* at 74.

[71]   *Id.* at 72.

[72]   *Piper Aircraft,* 454 U.S. at 255.

[73]   *See id.* at 255-56.

[74]   *Norex Petroleum,* 416 F.3d at 154 (quoting *Iragorri,* 274 F.3d at 71).

[75]   *See Iragorri,* 274 F.3d at 72-73.   *See also Wiwa*, 226 F.3d at 103.

-15-

A court must, however, consider whether the plaintiff's choice of forum appears to be "motivated by desire to impose tactical disadvantage on the defendant."[76] Where there are indicia of forum shopping, the presumption in favor of the plaintiff's choice of forum "may not apply, either at all or with full force."[77] Indicia of forum shopping may include: "attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case . . . [and] the inconvenience and expense to the defendant resulting from litigation in that forum."[78]

Finally, a court may accord diminished deference to a plaintiff's choice of forum where a plaintiff voluntarily enters into a transaction outside the United States, and "the cause of action does not have significant ties to the plaintiff's home forum."[79] A court will determine whether, in the "particular circumstances," the plaintiff had the "expectation . . . that any litigation arising from [the transaction] will be conducted " in the foreign jurisdiction.[80]

## 2. Adequacy of the Alternate Forum

---

[76] *Iragorri,* 274 F.3d at 73.

[77] *Norex Petroleum,* 416 F.3d at 154.

[78] *Iragorri*, 274 F.3d at 72. *Accord Norex Petroleum,* 416 F.3d at 155.

[79] *Carey v. Bayerische Hypo-Und Vereinsbank, A.G.,* 370 F.3d 234, 237 (2d Cir. 2004).

[80] *Id.* at 238.

-16-

After determining the appropriate degree of deference, "the court must consider whether an adequate alternative forum exists."[81]  The movant bears the burden to demonstrate the adequacy of the alternate forum.[82]  "Ordinarily, this requirement will be satisfied when the defendant is amenable to process in the other jurisdiction.  In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied."[83]  The mere fact that the substantive law in the alternative forum is less favorable to the plaintiffs is not sufficient to show that the alternative forum is inadequate.[84]  However, the alternative forum has been ruled inadequate "where the alternative forum does not permit litigation of the subject matter of the dispute,"[85] and where "a statute of limitations bars the bringing of a case in a foreign forum that would be timely in the United States."[86]

---

[81]     *Iragorri*, 274 F.3d at 73.

[82]     *See Norex Petroleum*, 416 F.3d at 157.

[83]     *Piper Aircraft*, 454 U.S. at 255 n.22.

[84]     *See id.* at 247.

[85]     *Id.*

[86]     *Norex Petroleum*, 416 F.3d at 159.

However, it is the plaintiff that carries the burden of proof when contesting the adequacy of the alternate forum on the basis that the court system is corrupt or inefficient, because "considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards."[87]  Courts are reluctant "'to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation.'"[88]  Consequently, "[t]he 'alternative forum is too corrupt to be adequate' argument does not enjoy a particularly impressive track record."[89]  Along those lines, in *Tuazon v. R.J. Reynolds Tobacco Co.,* the appellate court found that a trial court had erred in its conclusion that the Philippines was an inadequate forum, where that ruling was based on the plaintiff's "general allegations" of corruption and delay in the Philippine court system.[90]  Instead,

---

[87]     *PT United Can*, 138 F.3d at 73.

[88]     *Id.* (quoting *Blanco v. Banco Industrial De Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir. 1993)).

[89]     *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997) (collecting cases). *See also id.* at 1080-81, 1086-87 (denying motion to cede jurisdiction to Bolivia, because defendants' attorney, who was godfather to the illegitimate child of a Bolivian judge, influenced that judge to order the unlawful imprisonment of plaintiff's Bolivian representative).

[90]     *See* 433 F.3d 1163, 1178-80 (9th Cir. 2006) (affirming dismissal on other grounds).

plaintiffs must "plainly demonstrate that [they] are highly unlikely to obtain basic justice [in the foreign jurisdiction]."[91]

### 3.    Balancing Public and Private Factors

The private interests that courts must consider relate to the relative convenience to the litigants of the alternative fora.[92]  These factors include: "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling [witnesses], and the cost of obtaining attendance of willing[] witnesses . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive."[93]  In undertaking this analysis, courts should examine the specifics of the claims: "[r]ather than simply characterizing the case as one in negligence, contract, or some other area of law, the court should focus on the precise issues that are likely to be actually tried."[94]  However, courts need not undertake to identify all "the rights, remedies, and procedures available under the law that would be applied in each forum."[95]  "Public interest factors include: court

---

[91]    *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1312 (11th Cir. 2001).

[92]    *See Iragorri,* 274 F.3d at 73.

[93]    *Id.* at 73-74 (quoting *Gulf Oil Corp.*, 330 U.S. at 508).

[94]    *Id.* at 74.

[95]    *Piper Aircraft*, 454 U.S. at 252.

-19-

congestion; the interest of forums in having local disputes decided at home; and,

the interest in having issues of law decided by courts of the nation whose law is

involved."[96]

### 4.    Conditional Dismissal

Where the foregoing three-step analysis strongly favors dismissal,

courts may nevertheless impose conditions on dismissal in order to address

lingering concerns that litigation in the foreign forum may nevertheless have a

significant impact on the plaintiff's ability to seek redress.[97]

> [C]ourts must take measures, as part of their dismissals in
> forum non conveniens cases, to ensure that defendants will
> not attempt to evade the jurisdiction of the foreign courts.
> Such measures often include agreements between the
> parties to litigate in another forum, to submit to service of
> process in that jurisdiction, to waive the assertion of any
> limitations defenses, to agree to discovery, and to agree to
> the enforceability of the foreign judgment.[98]

Courts should also include a "return jurisdiction clause," which permits refiling in

the United States if the defendant's proposed alternative forum turns out to be

---

[96]    *Carey,* 370 F.3d at 237.

[97]    *See Norex Petroleum,* 416 F.3d at 159-60.

[98]    *Baris v. Sulpicio Lines,* 932 F.2d 1540, 1551 (5th Cir. 1991).

inadequate.[99]

## B.    Philippine Law

It is neither necessary nor desirable to undertake a detailed analysis of

Philippine law.  Nonetheless, in order to decide this motion I must determine: (1)

whether Philippine courts permit adjudication of the subject matter of the dispute;

(2) whether any conditions must be placed upon dismissal; and (3) identify the

specific questions of law and fact which are most vital to the dispute and must

therefore weigh most heavily in balancing the public and private interests in this

case.

### 1.    Philippine Negotiable Instruments Law

Neither party disputes that Plaintiff's right to enforce the instrument

will be determined to a great extent by The Negotiable Instruments Law of the

Philippines ("Act 2031").[100]  Act 2031 has much in common with Articles three

and four of the Uniform Commerical Code ("U.C.C."), including use of the

---

[99]     *Id.  Accord Ingram Micro, Inc. v. Airoute Cargo Express,* No. 99 Civ.
12480, 2001 WL 282696, at *7 (S.D.N.Y. Mar. 22, 2001).

[100]    *See* The Negotiable Instruments Law of the Philippines, Act. No.
2031, Ex. 8 to Zelermyer Decl.

concepts of negotiation,[101] holder,[102] and holder in due course.[103]   Under

Philippine law, a holder in due course holds the instrument "free from defenses

available to prior parties among themselves, and may enforce the payment of the

instrument thereon."[104]   However, "in the hands of any holder other than a holder

in due course, a negotiable instrument is subject to the same defenses as if it were

non-negotiable."[105]  A holder is one who possesses an instrument payable to

bearer, or is the named payee or endorsee of an instrument and is in possession of

that instrument.[106]  A holder in due course is one who:

> has taken the instrument under the following conditions:
> (a) That it is complete and regular on its face; (b) That he
> became the holder before it was overdue, and without
> notice that it has previously been dishonored, if such was
> the fact; (c) That he took it in good faith and for value; (d)
> That at the time it was negotiated to him, he had no notice
> of any infirmity in the instrument or defect in the title of
> the person negotiating it.[107]

---

[101]   *See id.* § 30.

[102]   *See id.* § 51.

[103]   See *id.* § 52.

[104]   *Id.* § 57.  *Cf.* U.C.C. Art. 3 § 3-305.

[105]   Act No. 2031 § 58.

[106]   *Id.* § 30.

[107]   *Id.* § 52.

Under Philippine law the signature of an agent as drawer of a check may be effective against the principal:

> The signature of any party may be made by a duly authorized agent. No particular form of appointment is necessary for this purpose; and the authority of the agent may be established as in other cases of agency.[108]

Philippine law also addresses issues raised by forged signatures:

> When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired under such signature, unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority.[109]

### 2.    Philippine Bank Secrecy Law

Republic Act No. 1405 ("Act 1405") generally prohibits disclosure of information concerning bank deposits without written permission of the depositor.[110] One statutory exception applies "where the money deposited or invested is the subject matter of the litigation."[111] One who violates this law may

---

[108]    *Id.* § 19.

[109]    Act No. 2031 § 23.

[110]    *See* Republic Act No. 1405, Ex. 10 to Motion to Dismiss, § 2.

[111]    *Id.*

-23-

be subject to a fine or imprisonment for up to five years.[112]

The Second Circuit evaluates "the propriety of a subpoena directing the production of information or documents located abroad where such production would violate the law of the state in which the documents are located" using an analysis derived from section 40 of the Restatement (Second) of the Foreign Relations Law of the United States (1965).[113] The two most critical factors to be considered are "'[the] vital national interests of each of the states,'" and "'the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person.'"[114]

Act No. 1405 states that "it is the policy of the Government to give encouragement to the people to deposit their money in banking institutions and to discourage hoarding."[115] To further this goal, Act No. 1405 protects depositors from unwanted disclosure of their assets.[116] Under the law, banks may not disclose

---

[112]    *See id.* § 5.

[113]    *United States v. Davis*, 767 F.2d 1025, 1033 (2d Cir. 1985). *Accord Cochran Consulting, Inc. v. Uwatec USA, Inc.,* 102 F.3d 1224, 1228 (D.C. Cir. 1996) (collecting cases).

[114]    *Garpeg, Ltd. v. United States*, 583 F. Supp. 789, 795 (S.D.N.Y. 1984) (quoting the Restatement (Second) Foreign Relations Law, § 40).

[115]    Act No. 1405 § 1.

[116]    *See id.* §§ 1-3.

-24-

depositor information without the depositor's written consent.  However, if this consent is given, the law does not provide banks an independent basis upon which to refuse disclosure.[117]

      As to the hardship factor, "[i]t is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for nonproduction."[118]  But where the disclosure provision is subject to waiver by those it protects, a party may be required to make good faith efforts to obtain such waiver.[119]  Whether to impose such a requirement is within the district court's discretion.[120]

## IV.   DISCUSSION

### A.   The Degree of Deference Due to Plaintiffs' Choice of Forum

      Two factors favor according full deference to Plaintiffs' choice of forum.  *First*, because Plaintiffs are residents of the United States and Metrobank is a foreign corporation, Plaintiffs are considered to be in their home forum despite the fact that New York is not their home district.  *Second*, there is no evidence that

---

[117]    *See id.*

[118]    *Societe Internationale Pour Participations Industrielles et Commerciales, S.A., v. Rogers*, 357 U.S. 197, 211 (1958).

[119]    *See Trade Dev. Bank v. The Continental Ins. Co.,* 469 F.2d 35, 40-41 (2d Cir. 1972).

[120]    *See id.*

Plaintiffs seek to evade the application of Philippine law. While Plaintiffs argue that Act No. 1405 does not bar Metrobank from disclosing information concerning Account No. 00701-550691-8 because the account is part of the "subject matter of the litigation," they do not argue that the law is invalid or inapplicable in United States courts.[121] Plaintiffs do not dispute that Philippine negotiable instruments law will apply.

However, there are several factors that favor minimal deference to Plaintiffs' choice of forum. Plaintiffs claim to be successors to David Henderson's interest in the Manager's Check. Henderson obtained the check by means of a transaction that occurred in the Philippines, in circumstances which should have given rise to the expectation that any litigation concerning the Manager's Check would occur in the Philippines. When Henderson obtained the check, he knew the check was drawn on a Philippine bank to a Filipino payee. He also knew that the Manager's Check had been dishonored at least once, and that the instrument would probably be enforceable only through litigation. Thus, Henderson "actively sought international business" by transacting business abroad and should have anticipated litigation in a foreign venue.[122] Plaintiffs allege that Henderson

---

[121]     *See* Pl. Opp. at 4.

[122]     *Carey,* 370 F.3d at 237.

-26-

brought the Manager's Check to the United States because the instrument could

not be safely held in the Philippines, but they have presented no evidence to

support this contention.[123]  It is more likely that Henderson brought the Manager's

Check to the Unites States with the expectation that this would support an

argument favoring jurisdiction in an American court.  For the foregoing reasons,

the deference ordinarily accorded Plaintiffs' choice of forum will be applied with

"less than . . . full force."[124]

### B.    The Availability of an Alternative Forum

It is uncontested that Metrobank is amenable to service of process in

the Philippines.[125]  Metrobank has further shown that the Philippine negotiable

instruments law provides a remedy to Plaintiffs, if they are entitled to payment on

the check.  Thus, Metrobank has carried its burden to show that the Philippines

provides an alternative forum for this dispute.  Plaintiffs contend, however, that

corruption and inefficiency in the Philippine courts renders this alternative forum

illusory.

---

[123]    *See* Compl. ¶ 13 ("[I]t became apparent that it would be prudent to transfer the instrument out of the Philippines and into the United States for safekeeping.").

[124]    *Norex Petroleum,* 416 F.3d at 154.

[125]    *See* Puno Aff. ¶ 6.2.

Plaintiffs bear the burden to show, by specific evidence, that the courts of the Philippines are unlikely to provide Plaintiffs with "basic justice."[126] Plaintiffs, relying entirely on a few excerpts from the ALI report, fail to meet this burden. The report does not provide specific evidence of corruption. Rather, it presents isolated data from public opinion surveys compiled by third parties. At best, the report merely documents that some members of the Philippine legal profession and the general public perceive that corruption is a widespread problem. The report offers no evidence to permit this Court to assess whether this perception is accurate. Furthermore, the report contains findings that show that the court system of the Philippines has institutionalized practices, such as oversight procedures and merit-based judicial appointments, that promote honesty and fairness.

Nor does the report provide any basis to conclude that Plaintiffs will be denied justice by excessive delay. In 2005, the number of cases cleared by the Regional Trial Courts equaled the number of cases filed. Assuming that the report's finding that filing-to-completion times may exceed five years is accurate,

---

[126]     *Leon*, 251 F.3d at 1312.

this is within the range other courts have deemed acceptable.[127]  Indeed, "delays of

a few years [are] of no legal significance in the forum non conveniens calculus."[128]

The ALI report states that "[t]he Philippine judiciary has many

strengths, which makes it a model for other countries in the region."[129]  A federal

appellate court has noted: "In a long list of cases . . . the Philippines has been

found to be an adequate forum."[130]  The evidence provided by Plaintiffs is

insufficient to warrant a contrary finding here.

### C.    Balancing Public and Private Factors

The most consequential of the private factors in this case is the

inconvenience and expense of arranging for the deposition of witnesses located

abroad, and of bringing witnesses from the Philippines to this forum to testify.

The greater the number of foreign-resident witnesses that are likely to be required,

the more weighty this factor becomes.  To evaluate this factor, this Court must

---

[127]    *See, e.g., Eastman Kodak*, 978 F. Supp. at 1086 (rejecting trial court delay of five years as a ground for denying a motion to dismiss for *forum non conveniens*).

[128]    *Bhatnagar by Bhatnagar v. Surrendra Overseas*, 52 F.3d 1220, 1227 (3d Cir. 1995).

[129]    ALI Report at 1.

[130]    *Tuazon,* 433 F.3d at 1180.

determine how many of the potential witnesses listed in the parties' initial disclosures are likely to be deposed or to testify.

Three issues will likely determine Plaintiffs' right to enforce this instrument. The first is the authenticity of the instrument when issued to Duran. The second is whether and to what degree Duran's right to enforce the instrument has been transmitted to Plaintiffs. The third is whether Metrobank has defenses to payment based on the underlying obligation that gave rise to the instrument.

A forged instrument is unenforceable under Philippine law, and Metrobank has indicated that its primary defense to this action will be that the instrument is a forgery. Metrobank has disclosed seven witnesses with information relevant to the determination of the instrument's authenticity. These witnesses and their proffered testimony are: (1) Angelito M. Villanueva, who has information concerning "instruments issued by Metrobank in or about March 2000,"[131] (2) Reynaldo C. Burgos, who possesses knowledge of the "features of Metrobank's checks,"[132] (3) a representative of Tone Guide Press, Inc., who has information concerning "printing and delivery of Metrobank checks,"[133] (4) Sonia

---

[131]     Metrobank's Disclosures ¶ A1.

[132]     *Id.* ¶ A2.

[133]     *Id.* ¶ A5.

D. Pastrana, who is familiar with "Metrobank policies and procedures regarding printing and delivery of Metrobank checks,"[134] (5) Rosa K. Sarmiento, who is familiar with "authorized signatories of Metrobank,"[135] (6) Jeanee N. Tan, who also has information concerning "authorized signatories of Metrobank,"[136] and (7) Ma. Teresa P. Del Rosario, who can authenticate Metrobank records.[137] Each of these witnesses is a resident of the Philippines. Except for the representative of Tone Guide Press, each is also a current employee of Metrobank.[138] Plaintiffs offer, in response, an expert witness who is a resident of New Jersey.[139]

The degree to which Plaintiffs may be able to step into the shoes of Duran, the payee, and insist on payment, will be determined by the manner in which the instrument passed from Duran, to Perez, to David Henderson and the Trust, and finally to Michael Henderson and the Trust. Plaintiffs contend that they are holders in due course of the Manager's Check,[140] and there is a rebuttable

---

[134]    *Id.* ¶ A6.

[135]    *Id.* ¶ A8.

[136]    *Id.* ¶ A9.

[137]    *Id.* ¶ A10.

[138]    *See id.* ¶¶ A1-A2, A5-A6, A8-A10.

[139]    *See* Pl. Disclosures (witnesses) ¶ 11.

[140]    *See* Compl. ¶ 20.

presumption under Philippine law that any holder is a holder in due course.[141]  But

the Complaint suggests that Perez took the instrument from Duran with notice that

it had been dishonored, and that David Henderson also had notice that the check

had been dishonored.  Under Philippine law, a person who takes an instrument

with notice that it has been dishonored is not a holder in due course.  Thus, it may

well be that neither Perez, David Henderson, nor Plaintiffs are or were holders in

due course.  Indeed, it is unclear whether Duran ever endorsed or negotiated the

check to Perez.  Plaintiffs' right to enforce the instrument, if any, will almost

certainly require testimony concerning the transfer of the instrument from Duran

to Perez, and then to David Henderson.

The testimony of Perez and Duran, both of whom are presumed to be

in the Philippines, will be necessary to resolve these questions.  Plaintiffs listed

both as witnesses.[142]  Plaintiffs also list three witnesses from the Philippines who

"are or were Metrobank employees," including Rafael Ayuste and two others, and

state that these individuals attended the October, 2002 meeting between

Metrobank officials and Perez.[143]  Plaintiffs list three other individuals with

---

[141]    *See* Act No. 2031 § 59.

[142]    *See* Pl. Disclosures (witnesses) ¶¶ 2-3.

[143]    *Id.* ¶ 5.

knowledge of this meeting.  One of these, Lilia C. Pastoral, is a trustee of the

Trust, and a Philippine resident.[144]  The other two, Arturo Balbastro and Dr. Ambu

Moraka, worked with Plaintiffs or their predecessors to resolve issues relating to

the check, and are residents of the Philippines and India, respectively.[145]  What

occurred at this meeting is relevant to determining Plaintiffs' right to enforce the

instrument.  Metrobank also lists Ayuste in its initial disclosures as a person

possessing information concerning the dishonor of the check at the October 2002

meeting.[146]

Because Plaintiffs may not be holders in due course of the instrument,

Metrobank may be able to assert defenses arising from the underlying obligation.

Metrobank discloses one witness, Jovencio R. Capulong, Jr., a Metrobank

employee whose knowledge of the cash transfers from Citibank would be relevant

to such defenses.[147]  Capulong is a Philippine resident.  Plaintiffs list three

managers and executives of Metrobank's headquarters in Makati City, and

unnamed managers of Citibank's offices in Makati City, whom they claim have

---

[144]     *See id.* ¶ 9.

[145]     *See id.* ¶¶ 12, 14.

[146]     *See* Metrobank's Disclosures ¶ A7.

[147]     *See id.* ¶ A11.

information relevant to the transactions.[148]  Plaintiffs also intend to seek testimony from unnamed managers at Citibank's New York offices.[149]

Plaintiffs disclose that they may testify, although the subject matter of their testimony is not specified.  It appears, however, that the only matters of which Plaintiffs have direct knowledge relate to the existence and management of the Trust.  These issues are incidental to the outcome of the case, especially by comparison to the far more critical questions discussed above.

Finally, both sides intend to offer documentary evidence.  Metrobank specifies six documents or categories of documents that relate to the issue of the authenticity of the Manager's Check, and one data compilation relating to the transactions underlying the check's issuance.[150]  All of these documents are located in the Philippines.  Plaintiffs intend to offer documents relating to the underlying transaction and the issuance of the check.[151]  They further intend to offer correspondence of David Henderson and a deposition of Henderson taken by

---

[148]     *See* Pl. Disclosures (witnesses) ¶¶ 8, 13.

[149]     *See id.* ¶ 7.

[150]     *See* Metrobank's Disclosures ¶¶ B1-B6.

[151]     *See* Pl. Disclosures (documents) ¶ 2.

Plaintiffs' attorney before Henderson's death.[152]  Although the location of these documents is not specified, it is presumably in the United States.  Finally, Plaintiffs will offer the Manager's Check itself, which is in a safe deposit box at a PNC bank branch in Louisville, Kentucky.[153]

        As the foregoing demonstrates, seventeen of the individuals who possess information relevant to this case are residents of the Philippines.  Many of these are current employees of Metrobank.  For the purposes of this motion, I shall assume that these individuals could be compelled to testify.  Other Filipino witnesses listed by both parties are unlikely to be subject to this Court's jurisdiction.  Metrobank, on the other hand, has offered uncontradicted evidence that all of these witnesses would be subject to compulsory process in the Philippines.[154]  Only the unnamed managers of Citibank's New York office are more likely to be subject to this Court's jurisdiction than that of a court of the Philippines.

        Considerations of cost and convenience also weigh heavily in favor of dismissal.  There is no evidence that the cost and convenience of transporting

---

[152]    *See id.* ¶ 3.

[153]    *See id*, Pl. Opp at 3.

[154]    *See* Puno Aff. ¶ 6.2.

-35-

necessary documents favors one forum or the other.  However, because the

overwhelming majority of critical witnesses are located in the Philippines, the cost

and inconvenience of litigation would be substantially higher in this forum.

Because many of the witnesses identified by both sides are Metrobank employees,

this burden would fall disproportionately on defendant.  Finally, while Plaintiffs

allege that because of threats against Duran, it is more likely that she would agree

to testify in the Unites States than in the Philippines, the allegations of these

threats lack specificity and are unsubstantiated.[155]

Public factors that must be considered include the interest of each

forum in adjudicating local disputes and their interests in deciding issues of local

law.[156]  Both factors strongly favor dismissal.  All of the transactions determinative

of Plaintiffs' right to enforce this instrument took place in the Philippines, and the

most critical legal issues are questions of Philippine law.  Several provisions of the

Negotiable Instruments Law of the Philippines are likely to play a decisive role in

this case.  In the United States, "the U.C.C. has supplied the basic legal framework

for bank deposits and check collections."[157]  The banking system "depends" on the

---

[155]     *See* Pl. Opp. at 3; Compl. ¶ 11.

[156]     *See Carey,* 370 F.3d at 237.

[157]     *Bank One Chi., N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 266 (1996).

"stability, predictability, and integrity" of this framework.[158]  Provisions of Act

No. 2031 parallel those of Article 3 of the U.C.C. in many respects.[159]  It is

apparent that the Negotiable Instruments Law of the Philippines, like the U.C.C.,

is a legal framework whose integrity is of vital importance to the Philippine

economy.  In contrast, to the extent that United States law is implicated here, the

issues are minor.  Thus, the Philippines' interest in adjudicating this dispute is

much greater than that of the United States.

These findings, together with this Court's determination that

Plaintiffs' choice of forum is entitled only to limited deference, compel the

conclusion that the both the private and public factors weigh in favor of dismissal.

## D.    Conditions of Dismissal

As discussed above, where a foreign defendant's motion for dismissal

on the ground of *forum non conveniens* is granted, it is usually appropriate to grant

---

[158]    *Farm Credit Servs. of Am. v. American State Bank*, 339 F.3d 764, 772
(8th Cir. 2003).

[159]    Compare, for example, Act No. 2031§ 1 with U.C.C. § 3-104
(definition of negotiable instrument); Act No. 2031§ 30 with U.C.C. § 3-
201(negotiation); Act No. 2031 § 51 with U.C.C. § 3-301 (rights of a holder); Act
No. 2031 § 52 with U.C.C. § 3-302 (rights of a holder in due course); Act No 2031
§ 61 with U.C.C. § 3-414 (obligation of drawer); Act No. 2031 § 65 with U.C.C. §
3-416 (transfer warranties); Act No. 2031 § 62 with U.C.C. § 3-413 (obligation of
acceptor).

dismissal only upon certain conditions that ensure that the interests of the plaintiffs are not prejudiced by the court's refusal to exercise its jurisdiction. Here, it is appropriate to ensure that Plaintiffs are not barred from the Philippine courts by a statute of limitations. Plaintiffs must also be protected from any other defenses that may have arisen during the pendency of this action.

Metrobank is entitled to refuse to disclose depository information to the extent necessary to avoid the substantial harm of criminal sanctions under Act No. 1405, and the purpose of that statute, to protect Philippine bank depositors, must also be respected. However, given the United States residency of Plaintiffs, and the extremely large sum of money involved in this case, the United States has a strong interest in ensuring that this action is resolved on its merits. Balancing these considerations, this Court will also place limitations on Metrobank's ability to invoke Act No. 1405 as a means to avoid disclosure of information relevant to this case. This Court is principally concerned with ensuring that Act No. 1405 does not limit disclosure of relevant facts beyond that degree which is actually necessary to protect Metrobank from the possibility of criminal sanctions. Therefore, to the extent that Metrobank is capable of avoiding these sanctions, Metrobank will be required to do so.

This case is dismissed, without prejudice, upon the following

-38-

conditions: (1) Metrobank must waive any statute of limitations defense, and must submit an affidavit affirming that such defenses are waivable under Philippine law; (2) Metrobank must waive any other defenses that have arisen since February 9, 2006; (3) Metrobank must affirm by affidavit that neither Metrobank, nor any of its agents, subsidiaries, or affiliates named in its 2005 annual report are a depositor entitled to give permission to disclose information concerning Account No. 00701-550691-8,[160] or, in the alternative, Metrobank must execute such written permission pursuant to Act No. 1405, section 2; (4) Metrobank must affirm by affidavit that it will make good faith efforts to secure permission from others necessary to permit disclosure of information concerning that account; and (5) Plaintiffs will be permitted to re-file this case in a court of the United States if the action cannot be maintained in the courts of the Philippines, Metrobank is not amenable to service of process in Philippines, Metrobank fails to comply with any of the conditions of dismissal stated above, or the courts of the Philippines decline to enforce any of the conditions stated above.

## V.    CONCLUSION

For the foregoing reasons, Metrobank's motion to dismiss this action is granted. This case is dismissed, without prejudice, subject to the conditions

---

[160]    *See* 2005 Annual Report at 73-81.

specified above.  Metrobank shall make submissions with respect to these

conditions as directed.  This Court shall retain jurisdiction over the parties solely

for the purpose of determining the sufficiency of Metrobank's submissions.  The

Clerk of the Court is directed to close this motion [docket no. 22] and this case.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            November 21, 2006

### -Appearances-

**For Plaintiffs:**

Joseph John D'Erasmo, Esq.
Joseph J. D'Erasmo & Associates
103 North Adams Street
Rockville, MD 20850
(301) 762-8865

Nizar A. DeWood, Esq.,
401-B Main Street, 2nd Floor
P.O. Box 328
Laurel, MD 20725
(301) 445-7001

**For Defendant:**

Benjamin Zelermyer, Esq.
Law Offices of Wesley Chen
641 Lexington Avenue
New York, NY 10022
(203) 855-8698